# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>ABUBAKAR ATIQ DURRANI<br><br>_____<br>_Defendant(s)_ | )<br>)<br>)<br>)<br>)<br>) |

Case No.  1:13MJ-475

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 2008 through the present _____ in the county of _____ Hamilton and Butler _____ in the

_____ Southern _____ District of _____ Ohio _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sec. 1035<br>18 U.S.C. Sec. 1347 | False statements relating to health care matters<br>Health care fraud |

This criminal complaint is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

_____
Complainant's signature

**S/A RYAN HOUSTON, HHS**
Printed name and title

Sworn to before me and signed in my presence.

Date: 7/22/13

_____
Judge's signature

Stephanie K. Bowman, Magistrate Judge
Printed name and title

City and state: _____ CINCINNATI, OHIO _____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **AFFIDAVIT IN SUPPORT OF** |
| **v.** | : | **CRIMINAL COMPLAINT** |
| | : | |
| **ABUBAKAR ATIQ DURRANI** | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - -

I , Ryan Houston, a Special Agent with the United States Department of Health and Human Services (HHS), being duly sworn, depose and state as follows:

## BACKGROUND

1. I am a Special Agent employed by the United States Department of Health and Human Services (DHHS), Office of Inspector General (OIG), Office of Investigations (OI). I am an investigative br law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2. As part of my duties I am authorized to conduct investigations, audits and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which the U.S. Department of Health and Human Services (HHS) is, or may be, a party of interest, and perform other duties on behalf of the Secretary of the Department of Health and Human Services. My chief responsibility is the investigation of fraud involving Federal Health Care Programs. As a Special Agent with the HHS-OIG-OI, I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime. Previously, I was employed as a Special Agent with the Ohio Attorney General's Office, Medicaid Fraud Control Unit (MFCU) for seven (7) years. My primary responsibility during this period of nine (9) years has been the investigation of criminal fraud against the health care programs commonly known as Medicare and Medicaid.

3. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from other parts of the investigation. The information contained in this affidavit is either personally known to me, based upon my interviews of various witnesses and the review of various records and publically available information, or has been relayed to me by other agents or other sworn law enforcement personnel.

4. I have not included each and every fact known to me concerning this investigation. I have set forth only sufficient detail to establish probable cause to support the criminal complaint against ABUBAKAR ATIQ DURRANI (hereinafter "DURRANI") for violating 18 U.S.C. § 1035 (false statements relating to health care matters) and 18 U.S.C. § 1347 (health care fraud).

## PROBABLE CAUSE

5. Defendant DURRANI is a citizen of the Republic of Pakistan and is a permanent resident of the United States of America. From approximately 2005 to the present, DURRANI has worked as a spine surgeon in and around the Southern District of Ohio, primarily in Cincinnati, Ohio. From approximately January 2005 to 2008, DURRANI was employed by Children's Hospital as an attending orthopedic surgeon and as an assistant professor at the University of Cincinnati Department of Orthopedic Surgery.

6. DURRANI resigned from Children's Hospital in 2008 and opened a private practice called Center for Advanced Spine Technologies ("CAST"). DURRANI is the sole owner of CAST.

7. CAST currently has two offices, one in Evendale, Ohio at 10475 Reading Road, Suite 206, Cincinnati, Ohio, 45241, and one in Northern Kentucky at 6905B Burlington Pike, Florence, KY 41042.

8. From 2008 through the present, DURRANI has performed numerous spine surgeries through his private practice, CAST. The surgeries were often performed at different hospitals in the Cincinnati area or through an outpatient surgery facility called

3

JourneyLite Surgery Center (JourneyLite). The JourneyLite facility is owned in part by DURRANI and is also located at 10475 Reading Road, Cincinnati, Ohio 45241.

9. DURRANI has had privileges to perform surgeries at Christ Hospital, Deaconess Hospital, Good Samaritan Hospital and West Chester Hospital at various times, but no longer has privileges at any of those hospitals. During the past two years, DURRANI has primarily performed surgeries at JourneyLite and West Chester Hospital. DURRANI no longer has privileges at West Chester Hospital as of May 2013.

10. DURRANI has provided medical services to recipients of Medicare, Medicaid, Anthem, Humana, United HealthCare, and other healthcare benefit programs as that term is defined in Section 24(b) of Title 18, United States Code.

**Durrani's Medicare Billing**

11. As part of our analysis and investigation, I am aware of DURRANI's billing practices to Medicare for certain billing codes from 2/1/10 through 1/31/13.

12. During that three year period, surgeries in which DURRANI was the attending physician accounted for approximately $7.5 million in Medicare Part A payments. 95% of those payments were for surgeries at West Chester Hospital. In addition, during this same time period, DURRANI directly billed Medicare Part B more than $4.5 million and received over $1.1 million in Medicare Part B payments.

13. For code ICD-9 8106 (lumbar and lumbrosacral fusion of the anterior column, anterior technique), DURRANI billed the most anterior lumbar fusion surgeries (by number of patients) to Medicare in the State of Ohio during that three-year period. For that particular code, he billed three times as many patients to Medicare as the #2 Ohio

4

physician. For that same procedure, Medicare paid over twice as much to DURRANI as the #2 Ohio physician. Over that same time, DURRANI performed that procedure (ICD-9 8106) for 29% of his new patients, almost three times higher than the rate of the next highest Ohio physician.

14. For code ICD-9 8108 (lumbar and lumbrosacral fusion of the anterior column, posterior technique), DURRANI received the 5th highest amount of payments in the State of Ohio from Medicare during that three-year period. Among Medicare patients, DURRANI performed that procedure for 21% of his new patients.

15. For code ICD-9 8102 (other cervical fusion of the anterior column, anterior technique), DURRANI was the 5th highest surgeon in the State of Ohio for that procedure by number of Medicare patients during that three-year period. Among Medicare patients, DURRANI performed that procedure for 29% of his new patients.

**Scheme to Defraud**

16. Based on the investigation, beginning in approximately 2008 and continuing through the present, in the Southern District of Ohio and elsewhere, DURRANI derived significant profits by convincing patients to undergo medically unnecessary spinal surgeries and by billing private and public healthcare benefit programs for those fraudulent services.

17. In some circumstances, DURRANI's scheme to defraud resulted in serious bodily injury.

18. The scheme and artifice to defraud that DURRANI devised, executed and attempted to execute included the following patterns and practices:

5

a. At times, DURRANI would persuade the patient that surgery was the only option, when in fact the patient did not need surgery or other treatments would have been more effective.

b. At times, DURRANI would tell the patient the medical situation was urgent and that surgery was needed right away. He would also falsely tell the patient that he/she was at risk of grave injuries without the surgery.

c. For cervical spine patients, DURRANI would often tell a patient that there was a risk of paralysis or the head would fall off if the patient was in a car accident because there was basically nothing attaching the head to the patient's body.

d. DURRANI often did not read or ignored the radiology reports written by the radiologists for imaging such as xrays, CT scans, and MRIs.

e. DURRANI would provide his own exaggerated and dire reading of the patient's pre-operative imaging that was inconsistent with or plainly contradicted by the report written from the radiologist. At times, DURRANI provided a false reading of the imaging.

f. DURRANI ordered pain injections for a level of the spine that was inconsistent with the pain stated by the patient or the imaging.

g. DURRANI scheduled patients for surgeries without learning or waiting to know the results of certain pain injections or related therapies.

h. DURRANI often dictated his operative reports or other patient records months after the actual treatment.

      i.   DURRANI's operative reports contained false statements about the diagnosis for the patient, the procedure performed, and the instrumentation used in the procedure.

      j.   When a patient experienced complications resulting from the surgery, DURRANI at times failed to inform the patient of the issues or misrepresented the nature of the issues.

19. Physicians who previously worked with DURRANI have told investigators that they had concerns about DURRANI performing unnecessary surgeries.

20. Physicians who have treated former patients of DURRANI have opined that some of the surgical procedures performed by DURRANI on the patients were medically unnecessary.

21. Many of the patients treated by DURRANI for back and neck pain were left in a worse position due the unnecessary surgeries he performed, as well as the related health care fraud and false statements. Examples of cases are provided below.

22. **PATIENT 1:** For Patient 1, in 2012, DURRANI diagnosed the patient as having instability at the C1-C2 level and recommended a significant fusion surgery. As part of the diagnosis, DURRANI stated that Patient 1 had a large pannus near the C2 level of the neck that was the cause of the pain. However, the radiology report for the patient states that the imaging shows no pannus. Subsequent reviews of the imaging by other physicians have confirmed that Patient 1 did not have a pannus, did not have instability at that level, and did not need surgery.

23. **PATIENT 2:** For Patient 2, in 2012 and 2013, DURRANI diagnosed the patient as having instability at the C1-C2 level and recommended fusion surgery. As part of the diagnosis, DURRANI stated that Patient 2 had a large pannus near the C2 level of the neck that was the cause of the pain, even though the patient reported pain at a lower level of the spine. Again, reviews of the imaging by other physicians have confirmed that Patient 2 did not have a pannus, did not have instability, and did not need surgery.

24. **PATIENT 3:** DURRANI diagnosed Patient 3 with rotational instability at the C1-C2 level. DURRANI recommended a posterior spinal fusion with instrumentation at C1-C2 for Patient 3. He performed the surgery on Patient 3 on or about December 26, 2012. Reviews of the imaging by other physicians have confirmed that Patient 3 did not have instability and did not need surgery.

25. **PATIENT 4:** DURRANI diagnosed Patient 4 with rotational instability at the C1-C2 level. DURRANI recommended a spinal fusion at C1-C2 for Patient 4. He performed the surgery on Patient 3 on or about September 9, 2011. Reviews of the imaging by other physicians have confirmed that Patient 5 did not have instability and did not need surgery.

26. **PATIENT 5:** DURRANI diagnosed Patient 5 with instability at the C1-C2 level. DURRANI recommended a posterior spinal fusion with instrumentation for Patient 5 at the C1-C2 level. DURRANI performed the surgery on or about May 24, 2010. Reviews of the imaging by other physicians have confirmed that Patient 3 did not have instability and did not need surgery.

8

27. Based upon the aforementioned facts set forth in the affidavit, your affiant has probable cause to believe and does believe that ABUBAKAR ATIQ DURRANI has: (1) knowingly and willfully falsified, concealed, and covered up by trick, scheme or device, a material fact in connection with the delivery of or payment for health care benefits, items, or services involving a "health care benefit program"; (2) knowingly and willfully made a materially false, fictitious or fraudulent statement or used a writing or document knowing that it contains a materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items, or services involving a "health care benefit program"; and (3) in connection with the delivery of or payment for health care benefits, items, or services, knowingly and willfully executed and attempted to execute a scheme to defraud any "health care benefit program," and obtained by false or fraudulent pretenses, statements, or promises, any money or property under the care, custody, or control of any "health care benefit program."

I swear that this affidavit is true to the best of my knowledge and belief and further, your affiant sayeth naught.

Ryan Houston - Agent, HHS-OIG

Sworn to and subscribed before me this 22 day of July, 2013

Honorable Stephanie Bowman
United States Magistrate Judge
Southern District of Ohio

9